**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

**REDACTED VERSION**

******************************************

FEMME COMP INC., TECHNICAL AND PROJECT ENGINEERING, LLC, L-3 SERVICES, INC., DATA SYSTEMS ANALYSTS, INC., AND BEARINGPOINT, INC.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant,

And

SAVANTAGE FINANCIAL SERVICES, INC. and BOOZ ALLEN HAMILTON INC.,

Defendant-Intervenors.

******************************************

**FILED UNDER SEAL**

**PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

Case Nos. 08-409C, 08-419C, 08-432C, 08-454C, and 08-474C

(Judge Margaret M. Sweeney)

**MEMORANDUM IN SUPPORT OF BEARINGPOINT'S MOTION**
**FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Dated: July 15, 2008

Of Counsel:
Joseph J. Dyer
Grace Bateman
SEYFARTH SHAW LLP
815 Connecticut Avenue, N.W., Suite 500
Washington, DC 20006-4004

Kevin P. Connelly
SEYFARTH SHAW LLP
815 Connecticut Avenue, N.W., Suite 500
Washington, DC 20006-4004
(202) 828-5374 Telephone
(202) 641-9274 Protected Facsimile
*Counsel for the Plaintiff BearingPoint, Inc.*

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ....................v

STATEMENT OF THE CASE ....................1

QUESTIONS PRESENTED ....................1

STATEMENT OF FACTS ....................2

LEGAL ARGUMENT ....................7

I. THE ARMY'S FAILURE TO CONDUCT ITS BEST VALUE TRADE OFF ANALYSIS IN ACCORDANCE WITH THE SOLICITATION'S EVALUATION CRITERIA PREJUDICED BEARINGPOINT ....................7

A. The Army Intended To Award Approximately Five ID/IQ Contracts To Ensure Ongoing Competition In The Award Of Task Orders. ....................7

B. The Solicitation Established That Non-Price Factors Would Be Significantly More Important Than Price In The Army's Best Value Decisions. ....................8

C. The Army Awarded Contracts To The Five [redacted] ....................9

D. The SSA Noted [redacted] ....................12

E. The SSA Improperly Emphasized Price In Making The Best Value Award Decisions. ....................17

F. The Army Must Apply The Evaluation Plan Stated In The Solicitation. ....................20

II. THE ARMY'S EVALUATION OF [redacted] WAS INCONSISTENT WITH THE EVALUATION CRITERIA, AND THUS PREJUDICED BEARINGPOINT. ....................23

A. The Government Established Small Business Subcontracting Goals In The Solicitation And Reflected These In The Evaluation Plan. ....................23

B. [redacted] ....................24

TABLE OF CONTENTS
(continued)

PAGE


C. [redacted] ....25

D. [redacted] ....26

III. THE ARMY GAVE [redacted] ....28

A. [redacted] ....28

B. [redacted] ....29

1. [redacted] ....29

2. [redacted] ....29

3. [redacted] ....30

4. [redacted] ....30

C. [redacted] ....31

1. [redacted] ....31

2. [redacted] ..33

3. [redacted] ....35

D. [redacted] ....36

IV. The Army Violated FAR § 3.501 When It Failed To Take Appropriate Action To Ensure That The Awardees Would Not Recover Losses From Buying-In Through The Task Order Process. ....38

TABLE OF CONTENTS
(continued)

PAGE

A. The Army Had An Obligation To Identify Instances Of Buying-In And To Take Appropriate Action To Protect The Government From Being Over-Charged. ....38

B. The Army Failed To Identify [redacted] ....41

V. THE ARMY FAILED TO REASONABLY EVALUATE OFFERORS' PRICES. ....42

A. The Army Did Not Consider Whether The Proposed Labor Rates Were Reasonable. ....42

B. The Army Was Required To Evaluate Labor Rates To Determine Whether The Offerors Could Provide Qualified Personnel Necessary To Support The PMSS-2 Programs. ....42

C. [redacted] ....44

D. The Army Failed To Recognize The Advantages In BearingPoint's Staffing Plan ....46

VI. THE ARMY FAILED TO CONDUCT MEANINGFUL DISCUSSIONS WITH BEARINGPOINT. ....48

VII. THE ARMY'S BEST VALUE TRADE-OFFS WERE UNREASONABLE AND INCONSISTENT WITH THE STATED EVALUATION CRITERIA. ....49

CONCLUSION ....50

APPENDIX

Exhibit A – [redacted]

Exhibit B – [redacted]

Exhibit C – [redacted]

Exhibit D – [redacted]

TABLE OF CONTENTS
(continued)

PAGE

Exhibit E – [redacted]

Exhibit F – [redacted]

Exhibit G – [redacted]

Exhibit H – [redacted]

Exhibit I – [redacted]

Exhibit J – [redacted]

Exhibit K – [redacted]

# TABLE OF AUTHORITIES

STATUTES AND REGULATIONS PAGE(S)

10 U.S.C. § 2305 .......... 20

48 C.F.R.:

Section 3.501-1 .......... 39

Section 3.501-2 .......... 39-40, 41, 42, 50

Section 15.101-1 .......... 20

Section 15.306 .......... 48

Section 15.402(a) .......... 44-45

Section 15.404-1(a) .......... 45

Section 15.404-1(b) .......... 45

Section 15.608(a) .......... 20

CASES PAGE(S)

*Information Sci. Corp. v. United States*,
80 Fed. Cl. 759 (2008) .......... 21

*Latecoere Int'l, Inc. v. United States Dep't of Navy*,
19 F.3d 1342 (11th Cir. 1994) .......... 20

*American Lawn Serv., Inc.*,
B-267715, 95-2 CPD ¶ 278 (1995) .......... 21

*Blue Rock Structures, Inc.*,
B-293134, 2004 CPD ¶ 63 (2004) .......... 22

*EPSCO, Inc.*,
B-183816, 75-2 CPD ¶ 338 (1975) .......... 21-22

*Gemmo Implanti SpA*,
B-290427, 2002 CPD ¶ 146 (2002) .......... 37-38

*Halifax Technical Servs., Inc.*,
B-246236 *et al.*, 94-1 CPD ¶ 30 (1994) .......... 40-41

TABLE OF AUTHORITIES
(continued)


**PAGE(S)**

*Harbour Air, Inc.*,
B- 235534 *et al.*, 89-2 CPD ¶ 86 (1989) ........ 41

*Hot Shot Express*,
B-290482, 2002 CPD ¶ 139 (2002) ........ 37

*Metro Mach. Corp.*,
B-281872, 99-1 CPD ¶ 101 (1999) ........ 48

*Multimax, Inc.*,
B-298249 *et al.*, 2006 CPD ¶ 165 (2006) ........ 48-49

*NAHB Research Ctr., Inc.*,
B-278876 *et al.*, 98-1 CPD ¶ 150 (1998) ........ 37

*Perini/Jones Venture*,
B-285906, 2002 CPD ¶ 68 (2000) ........ 37

*ProTech Corp.*,
B-294818, 2005 CPD ¶ 73 (2004) ........ 21

*SAMS El Segundo, LLC*,
B-291620, 2003 CPD ¶ 48 (2003) ........ 44-45

*SOS Interpreting, Ltd.*,
B-293026 *et al.*, 2005 CPD ¶ 26 (2004) ........ 21

*Systems Research & Applications Corp.*,
B-299818 *et al.*, 2008 CPD ¶ 28 (2007) ........ 28

*Systems Research & Applications Corp.*,
B-298107 *et al.*, 2006 WL 4701814 (Comp. Gen. June 26, 2006) ........ 28

*Universal Bldg. Maint., Inc.*,
B-282456 *et al.*, 99-2 CPD ¶ 32 (1999) ........ 36

## STATEMENT OF THE CASE

Plaintiff, BearingPoint, Inc. (BearingPoint) filed its Complaint in this matter on June 30, 2008. BearingPoint contended that the Defendant United States of America (Government, Army or Agency) had violated law and regulation to BearingPoint's prejudice in awarding contracts to Systems Research and Applications Corporation (SRAC), Booz Allen Hamilton (BAH), and Wyle Information Systems, LLC (Wyle) under Solicitation No. W91QUZ-07-R-0007 (Solicitation or RFP). The Solicitation sought proposals for information technology-related program management support services, under what is known as the Program Management Support Services-2 (PMSS-2) procurement. The Court consolidated BearingPoint's protest into Case No. 08-409C on July 2, 2008. This consolidated case includes Post-Award Protest Complaints filed by Femme Comp. Inc. (Femme), Technical and Project Engineering, LLC (TAPE), L-3 Services, Inc. (L-3), and Data Systems Analysts, Inc. (DSA) regarding the PMSS-2 procurement. BearingPoint, TAPE, L-3 and DSA had previously filed protests at the Government Accountability Office (GAO), which the GAO dismissed after Femme filed suit in this Court regarding the PMSS-2 procurement.

BearingPoint raised seven counts in its Post Award Protest Complaint. In large part, BearingPoint based these grounds on a review of protected material that BearingPoint had obtained under a GAO protective order related to this procurement.

## QUESTIONS PRESENTED

1. Whether in its best value award decision, the Army abandoned the Solicitation's weighting of the evaluation factors, gave far too much emphasis to price (labor hour rates), and effectively converted the procurement into a [redacted]?



DC1 30234775.1

2. Whether the Army properly applied the [redacted] subjecting BearingPoint to unequal treatment?

[redacted]

4. Whether the Army violated 48 C.F.R. (FAR) § 3.501 when it failed to take appropriate action to ensure that the awardees would not recover losses from "buying in" through the task order process?

[redacted] Whether the Army reasonably evaluated the awardees' offered prices when it failed to analyze [redacted]

[redacted] Whether the Army conducted meaningful discussions with BearingPoint when it [redacted]

7. Whether the Army's decision to award contracts to BAH, SRAC, and Wyle, instead of to BearingPoint, or, in the alternative, without including BearingPoint as an additional awardee, was reasonable and consistent with the stated evaluation criteria?

## STATEMENT OF FACTS

1. The Army's Acquisition Plan identified that the purpose of the PMSS-2 Acquisition was to find contractors who would "provide the full range of information technology-related program management support services, to include advisory and consulting services, required by the Office of the Army Chief Information Officer/G-6 (CIO/G-6) and the Program Executive Office, Enterprise Information Systems (PEO EIS) headquarters,

directorates, and program/project/ product offices, in support of various missions and of command, control, and communications activities." AR, Tab 1 at 1, 3.[1]

2. BearingPoint and L-3/Titan were the incumbent contractors for this work. AR, Tab 1 at 3.

3. The Government intended to award multiple IDIQ contracts with a guaranteed minimum value of $20,000 each. *Id.* at 4.

4. The Government would award future Firmed-Fixed-Price (FFP) and Time-and Materials (T&M) task orders through competition among the IDIQ contract awardees. *Id.* at 4-5.

5. The Government contemplated making five awards under the contract, including at least two awards to small business offerors; however, the Army reserved the right to make more than five awards in total, and more than three awards in the first group defined as being most advantageous to the Government regardless of size. AR, Tab 3 at 368.

6. The Acquisition Plan stated that its [redacted] AR, Tab 2 at 7, 11-12.

7. The Acquisition Plan noted that [redacted] *Id.* at 7.

8. The Acquisition Plan emphasized that [redacted] and that "[t]he post-award competition will give the Government continued best value." *Id.* at 12.

9. The Acquisition Plan stated that [redacted] *Id.* at 12.

[1] AR refers to the Administrative Record furnished by the Government in this action.

10. The Acquisition Plan opined that [redacted] *Id.*

11. The Acquisition Plan established that the estimated value of the PMSS-2 contracts over their five year life would be [redacted] *Id.* at 4, 13.

12. The Independent Government Estimate (IGE) was [redacted] AR, Tab 1 at 13.

13. The Army issued Solicitation W91QUZ-02-R-0007 on June 8, 2007. AR, Tab 3 at 48.

14. The Solicitation sought offers for information technology related program management support services. The nine main functional areas under which the Government may acquire support under this contract are: (1) Program/Project/Product Management Support; (2) Business Process Reengineering (BPR) Support; (3) Information Systems Security Support; (4) Contingency Planning Support; (5) Physical Security Support; (6) Enterprise Design, Integration, and Consolidation Support; (7) Systems Operation and Maintenance Support; (8) Integrated Logistics Support; and (9) Other Information Technology-Related Services and Support. *Id.* at 54-56; AR Tab 4 at 390.

15. The Solicitation contained a Master Labor Rate Table, reflecting approximately 90 positions for which offerors would have to provide hourly rates. AR, Tab 3 at 141-145.

16. The Solicitation contained an Addendum describing the positions which offerors were required to use as the basis for pricing the identified labor categories. AR, Tab 3 at 122-138, 212.

17. Contractors and their subcontractors could propose different rates for identified positions they were staffing. However, the Solicitation provided that the offeror's "price proposal will be evaluated using the HIGHEST proposed base year labor rate (prime or subcontractor rate) for each labor category, Government site and Contractor site." AR, Tab 3 at 108 (emphasis in the original).

18. The Solicitation included a Pricing Table stating how many hours per position the Army would use to calculate the evaluated cost. *Id.* at 109-110.

19. The Solicitation informed Offerors that all tasks orders awarded pursuant to the contract, whether awarded on a T&M or FFP basis, would be priced in accordance with the pricing set forth in the Contractor's Master Labor Rate Table. *Id.*

20. When submitting a proposal for a task order, the contractor would be required to use a rate equal to or lower than the labor rate in the Master Labor Rate Table for the labor category and type of personnel (prime or subcontractor personnel) proposed. *Id.*

21. The Solicitation further provided that "[a]t the request of either the contractor or the Government, the contractor may, throughout the life of the contract, propose additional labor categories, rates and descriptions." *Id.* at 51.

22. The Solicitation repeatedly referred to the "Offeror," not to the offeror and any affiliated companies. The RFP required offerors to identify the contractor team arrangements and relationships in their proposals. AR, Tab 3 at 236.

23. The Solicitation further required offerors to identify in Appendix A, Table 1 "Corporate Capability Resources" the nine functional areas that *the Offeror* would be performing on the PMSS-2 contract. AR, Tab 3 at 363.

24. The Performance Risk Assessment, Section L.7.2.1 stated that "[t]he Offeror shall submit three relevant (see relevancy criteria below) contracts under which *the Offeror* was responsible for or performed program management and at least two of the other functional areas as listed in the Performance Work Statement." AR, Tab 3 at 351.

25. Solicitation Section L.3.8.3 identified RTEC Services LLC and Acquisition Solutions, Inc. as support contractors providing acquisition support to the Government during the source selection process. AR, Tab 3 at 345.

26. The Solicitation noted that these support contractors will have access to offeror-provided proprietary information to enable them to perform their duties. *Id.* The support contractors were required to execute non-disclosure agreements with each offeror, which the offeror was required to include in its proposal. *Id.*

27. Section K contained a Corporate Certificate. AR, Tab 3 at 334.

28. Section K required the identification of Taxpayer Identification Number (TIN) for the offeror and its common parent if it has one. AR, Tab 3 at 336-337.

29. Finally, the Solicitation notified Offerors of the requirement to supply accurate information in their proposals. Section L.3 provided that "If in reviewing the proposal, the Government identifies or otherwise learns that the provided proposal information is not accurate or misrepresents the offeror's status or capabilities, that information may be used by the contracting officer as part of the offeror's responsibility determination and could result in the offeror not being eligible for award." AR, Tab 3 at 343.

# LEGAL ARGUMENT

## I. THE ARMY'S FAILURE TO CONDUCT ITS BEST VALUE TRADE OFF ANALYSIS IN ACCORDANCE WITH THE SOLICITATION'S EVALUATION CRITERIA PREJUDICED BEARINGPOINT.

### A. The Army Intended To Award Approximately Five ID/IQ Contracts To Ensure Ongoing Competition In The Award Of Task Orders.

The Government contemplated making five awards under the contract, including at least two awards to small business offerors; however, the Army reserved the right to make more than five awards in total, and more than three awards in the first group categorized as being most advantageous to the Government regardless of size:

> The Government will award contracts based upon best value to Offerors whose proposals are determined by the Government to be most advantageous, considering the evaluation factors set forth below. *The Government intends to award five (5) Indefinite Delivery, Indefinite Quantity (IDIQ) contracts overall to the offers that are determined to be the most advantageous to the Government. Initially, the Government intends to make three (3) awards to those Offerors whose proposals represent the best value to the Government. This first group of awards will be made without regard to the size of the Offeror.* Subsequently, the Government intends to award an additional group of two (2) contracts to small business Offerors whose proposals represent the best value to the Government. *This second group is reserved to small businesses.* An award may be made to a small business under the second group even though a large business Offeror not yet selected may have a higher technical rating and/or lower price. *The Government also reserves the right to make a third group of additional awards. Like the first group, the awards under the third group will be made without regard to the size of the Offeror.* While the foregoing expresses the intent of the Government with respect to the award group process, *the Government reserves the right to make more or less than three (3) awards under the first group;* it reserves the right to make more or less than two (2) awards under the second group; *and it reserves the right to make more or less than five (5) awards overall.* Absent adequate best value, the Government also reserves the right not to make awards under one or more of the groups, specifically to include not making awards under the second and third groups.

SOF ¶ 5; AR, Tab 1 at 1, 3. (emphasis added).

The Solicitation established that the awardees would then have the opportunity to compete against each other for PMSS-2 FFP and T&M task orders. Thus, a PMSS-2 contract award would essentially provide the awardee with a hunting license to compete for the FFP and T&M task orders for the PMSS-2 work.

### B. The Solicitation Established That Non-Price Factors Would Be Significantly More Important Than Price In The Army's Best Value Decisions.

The Solicitation identified five factors, some with subfactors, that the Army would evaluate to determine which contractors proposed best value and thus should receive contract awards:

- **Factor 1 – Corporate Capability**
  - Subfactor 1 – Knowledge of and Experience with DoD/Army Acquisition Policies and Processes
  - Subfactor 2 – Performance Capability and Resources to Support PEO EIS and CIO/G6 Programs
- **Factor 2 – Performance Risk**
- **Factor 3 – Technical/Management**
  - Subfactor 1 – Understanding of the PM Support Required
  - Subfactor 2 – Project Management Plan
- **Factor 4 – Price**
- **Factor 5 – Small Business Participation**

AR, Tab 3 at 379.

The Solicitation established the relative importance of the factors to each other, and overall. It provided that Corporate Capability was more important than Performance Risk, which in turn was more important than Technical/Management, which was more important than Price. The Solicitation stated that the Non-Price factors were significantly more important than the Price factor:

> Factor 1 is more important than Factor 2. Factor 2 is more important than Factor 3. Factor 3 is more important than Factor 4. Factor 4 is more important than Factor 5. *While the Price Factor will be an important part of the integrated selection decision, the non-price evaluation factors, collectively, are significantly more important than the Price factor.* Under Factor 1, Subfactor 1 is more important than Subfactor 2. Under Factor 3, the Subfactors are comparatively equal in importance.

AR, Tab 3 at 379 (emphasis added). The Solicitation also stated that Factor 1, Corporate Capability, by itself, was significantly more important than Factor 4, Price. It defines "Significantly More Important" to mean that "[t]he criterion is substantially more important than another criterion. The criterion *is given far more consideration* than another criterion." *Id.* (emphasis added).

### C. **The Army Awarded Contracts To The Five Offerors** [redacted]

The Army included twelve offerors in the competitive range. AR, Tab 39 at 10574. The table below identifies the offerors in the competitive range, from lowest to highest evaluated price, and indicates the offerors' ratings for the Non-Price Factors. The table shows that the Army awarded the three unrestricted, [redacted] The table further shows that, the Army also made two small business awards to [redacted][2]

---

[2] We have compiled this table based on the information found at AR, Tab 39, at 10574. The Table identifying Code Letters to Offerors is found at AR, Tab 39 at 10570.

| Offeror | Price | LB/ SB | Factor 1 Subfactor A Subfactor B | Factor 2 | Factor 3 | Factor 5 |
|---|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

This table reflects the Army's disregard for the Solicitation's mandate that the Non-Price Factors were significantly more important than Price. T[redacted]

[redacted]

[3] As we will discuss below, this awardee's [redacted] appears to be improper.

Thus the Army advertised the PMSS-2 procurement as a best value procurement in which Non-Price factors were significantly more important than Price, but treated it as [redacted] when making contract awards.

**D. The SSA Noted [redacted]**

In the Source Selection Decision (SSD), the Source Selection Authority (SSA) recognized the [redacted][4] Yet in both instances, the SSA determined that [redacted]

In the [redacted]

[redacted]

[4] Systems Research and Applications Corporation is referred to in the evaluation documents as [redacted]

[5] BAH was [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[6] The clear implication being that [redacted]

[7] The Administrative Record reflects that the Government did not attempt to [redacted]

[redacted]

[8] As we will discuss below, the evaluation of [redacted] factor is incorrect, as well as the Army's conclusion that [redacted] for this factor.

[redacted][9]

Similarly, in comparing BearingPoint ([redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[9] We will discuss below why the SSA's emphasis on Price was particularly inappropriate in a procurement of this nature.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

AR, Tab 39 at 10558 (emphasis added).[10]

**E. The SSA Improperly Emphasized Price In Making The Best Value Award Decisions.**

The Army correctly indicated in the Solicitation that Price was less significant in the initial contract award than the Non-Price factor because the true competition would be for the task orders. In the initial award of contracts the Government is attempting to identify the contractors' superior Non-Price factors. Higher labor rates do not necessarily mean higher task order pricing, and certainly not to the degree suggested by the Army's Price evaluation, which was based upon a Government-stated number of hours. In competing for a FFP task order, an offeror may be able to base its proposal on far fewer hours for a labor category because it is

[10] As we will discuss below, the Government's rating [redacted] was inconsistent with the evaluation criteria that the Army used in evaluating proposals for this factor. The Army should have evaluated [redacted] for this factor, which would have further demonstrated the [redacted]



DC1 30234775.1

using more experienced/competent individuals. For example, i[redacted]

In reaching the best value decision, the SSA seemed to lose sight that the evaluated price for purposes of the procurement was nothing more than the highest proposed labor rate per category multiplied by a set number of hours, and that the price arrived at by this approach gave no assurance of the total price the Government would pay for task orders under the awarded contracts. Thus the Solicitation logically emphasized the importance of Non-Price evaluation factors over Price in the award decision.

Notwithstanding BearingPoint's [redacted] The SSA did not offer a detailed explanation as to [redacted]

In fact, the SSD indicates that the SSA [redacted]

The SSA is careful to use best value wording, [redacted]

[redacted]

In other places, the SSA identifies a [redacted]

If the Army wanted to award contracts on the basis of [redacted] that is what it should have stated in the Solicitation. However, this is not what the Army claimed

it wanted to do. The Army was adamant that it would award on the basis of best value where the identified Non-Price evaluation factors were significantly more important than the Price factor.

**F. The Army Must Apply The Evaluation Plan Stated In The Solicitation.**

Statute and regulations require the Government to state in the Solicitation "all significant factors and subfactors which the head of the agency expects to consider evaluating" and to state the "relative importance assigned to each of those factors and subfactors." *See* 10 U.S.C §§ 2305(a)(2)(A)(i)-(ii); 48 C.F.R. (FAR) § 15.101-1(b)(1)-(2). Federal courts have held that an agency's failure to apply the evaluation plan in the solicitation where, as here, the agency improperly emphasized price over non-price factors, was improper. *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342 (11th Cir. 1994). In *Latecoere,* the solicitation for training system devices required the Navy to weight device design most heavily, with price the least important of the six evaluation factors. Nonetheless, in making the best value determination, the Navy awarded the contract to ETC, the low priced offeror, instead of awarding the contract to Latecoere, whose price was higher, but had higher evaluation scores for the five non-price evaluation factors. Latecoere protested and the District Court denied its protest, finding that the Navy had properly awarded the contract to ETC. Latecoere appealed, and the Eleventh Circuit reversed the District Court, finding that the Navy's emphasis on price over the non-price factors was contrary to the Solicitation and thus violated the law:

> There is strong evidence that cost was treated as the controlling factor even though Latecoere's proposal was technically superior to ETC's. Under the circumstances of this case, such a violation of the Solicitation would constitute a clear and prejudicial violation of 48 C.F.R. § 15.608(a) and is another reason why the district court should not have granted summary judgment against Latecoere.

*Id.* at 1359.

The Court of Federal Claims has also held that in a best value procurement where non-price factors are emphasized over price, the Government must follow this evaluation plan in making awards. *Information Sci. Corp. v. United States*, 80 Fed. Cl. 759 (2008). In *Information Sciences,* the Court found that the SSA's best value decision was "tainted" because he had disregarded the Solicitation's directive to emphasize technical factors over price:

> [T]he new SSA disregarded the Solicitation's directive to place significantly more weight on all technical evaluation factors than non price and "incentive plan" and, instead, accorded *equal or greater weight* on price and incentive plan [factors]." The SSA's error tainted the "best value" analysis....

*Id.* at 788. Here, as in *Latecoere* and in *International Sciences*, the SSA's best value decision is "tainted" because the SSA improperly emphasized Price over Non-Price factors.

GAO case law also confirms that in conducting its best value analysis the agency is required to apply the relative weighting of the evaluation factors as specified in the Solicitation. *See, e.g., ProTech Corp.*, B-294818, 2005 CPD ¶ 73 at 8 (2004) (finding a source selection decision unreasonable when the SSA's tradeoff determination accorded a factor less weight than identified in the RFP); *American Lawn Serv., Inc.,* B-267715, 95-2 CPD ¶ 278 at 4 (1995) (protest sustained because the agency "did not conduct a price/technical tradeoff analysis, but rather awarded the contract on the basis of the lowest-priced, technically acceptable BAFO."); *SOS Interpreting, Ltd.*, B-293026 *et al.*, 2005 CPD ¶ 26 at 10-11 (2004) (protest sustained where source selection decision was not reasonable or consistent with the solicitation's best value evaluation scheme).

In the best value comparison [redacted] This is a clear departure from the stated evaluation criteria. As the GAO noted in *EPSCO, Inc.*, B-183816, 75-2 CPD ¶ 338 at 7

(1975), when the Solicitation identifies technical factors as being more important than price, the Agency's determination to award to a technically inferior lower-priced proposal would be a departure from the established criteria and would have to be supported by an extremely strong justification:

> It is … conceivable that, notwithstanding an established evaluation and source selection plan placing primary importance on technical considerations, a source selection official could judge that the cost of a technically superior proposal is so high that selection of a lower-priced, technically inferior proposal is justified. *Such a selection, however, would be a departure from the established criteria and would have to be supported by an extremely strong justification.*

*Id.* (emphasis added); *see also Blue Rock Structures, Inc.*, B-293134, 2004 CPD ¶ 63 at 6 (2004) ("A tradeoff analysis that fails to furnish any explanation . . . why those technical advantages are not worth a price premium does not satisfy the requirement for a documented tradeoff rationale, particularly where, as here, price is secondary to technical considerations under the RFP's evaluation scheme.").

The cases we cite are clear: the Government is required to apply the evaluation factors stated in the proposal and must give offerors notice of how it will weigh each factor in the best value decision. Here, the Army ignored this well-established precedent, choosing to [redacted] In doing this, the Army has violated the law.

## II. THE ARMY'S EVALUATION OF [redacted] WAS INCONSISTENT WITH THE EVALUATION CRITERIA, AND THUS PREJUDICED BEARINGPOINT.

### A. The Government Established Small Business Subcontracting Goals In The Solicitation And Reflected These In The Evaluation Plan.

The Army established a minimum mandatory requirement in the Solicitation for overall Small Business Participation and non-mandatory objectives for six small business subcategories:

> The Government's minimum mandatory requirement of overall Small Business participation and the non-mandatory objectives for participation that are related to the identified small business subcategories are set forth in the following table:

| Category | Requirement/ Objectives |
|---|---|
| Small Business (inclusive of all categories below) (minimum requirement) | 20% (includes % below) |
| Small Disadvantaged Business (objective) | 6% |
| Woman-Owned Small Business (objective) | 5% |
| Service-Disabled Veteran-Owned Small Business (objective) | 3% |
| Veteran Owned Small Business (objective) | 3% |
| Hub-Zone Small Business (objective) | 1% |
| HBCU/MI (objective) | Positive Goal |

AR, Tab 3 at 383.

Further, the Solicitation provided that for evaluation purposes the Government would consider whether the offeror's approach met or exceeded the minimum mandatory requirement for small business participation, as well as the objectives for all the subcategories:

> 4.5.1 *The Government will evaluate the Offeror's approach to meeting or exceeding the Government's minimum mandatory requirement for overall Small Business participation and the non-mandatory objectives (see table below) for participation by Small Disadvantaged Business, Woman-Owned Small Business, Service-Disabled Veteran-Owned Small Business, Veteran Owned Small Business, HUBZone Small Businesses, and HBCU/MI in the performance of the PMSS2 contract. The amount by which the proposed percentage exceeds the overall small business category percentage and the amount by which the proposed percentages exceed the small business sub-category percentages will be considered.* The assessment will include the extent to which such

> firms are specifically identified in the proposals, the extent of commitment to use such firms (for example, enforceable commitments are more significant than non-enforceable commitments); the extent of participation of such firms in terms of the value of the total acquisition; and, for large businesses only, an assessment of the Offerors' Small Business goals for FY 2006 for the DoD and other Federal Government agencies and the actual goals achieved.

AR, Tab 3 at 382 (emphases added).

In the Source Selection Plan, [redacted]

**B.** [redacted]

| [redacted] | [redacted] | [redacted] |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

[redacted]

[redacted]

**C.** [redacted]

[redacted]

| [redacted] | [redacted] | [redacted] |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

[redacted]

[redacted]

[redacted]

**D.** [redacted]

[redacted]

| [redacted] | [redacted] | [redacted] |
| --- | --- | --- |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

[redacted]

[redacted] Here, the Army's evaluation was unreasonable, and inconsistent with the evaluation criteria. [redacted]

In contrast, [redacted] Thus, the Army's evaluation of [redacted] was not only inconsistent with the evaluation criteria, it was patently unreasonable.

## III. THE ARMY GAVE [redacted]

### A. [redacted]

[redacted]

[redacted] The Solicitation had required offerors to enter into nondisclosure agreements with RTEC Services LLC and Acquisition Solutions, Inc. and to include copies of these agreements with their proposals. AR, Tab 3 at 345. The nondisclosure agreements with RTEC Services LLC and Acquisition Solutions, Inc., [redacted]

---

11 [redacted]

**B.** [redacted]

**1.** [redacted]

[redacted]

**2.** [redacted]

[redacted]

[redacted]

[redacted]

3. [redacted]

[redacted]

[redacted]

4. [redacted]

[redacted]

[redacted]

C. [redacted]

1. [redacted]

[redacted]

[redacted]

[redacted]



DC1 30234775.1

[redacted]

| | |
|---|---|
| [redacted] | [redacted] |

[redacted]

12 [redacted]

[redacted]

[redacted]

2. [redacted]

[redacted]

[redacted]

13 [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

3. [redacted]

[redacted]

[redacted]

D. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

## IV. The Army Violated FAR § 3.501 When It Failed To Take Appropriate Action To Ensure That The Awardees Would Not Recover Losses From Buying-In Through The Task Order Process.

### A. The Army Had An Obligation To Identify Instances Of Buying-In And To Take Appropriate Action To Protect The Government From Being Over-Charged.

[redacted]

[redacted]

The FAR defines "buying-in" as follows:

> [S]ubmitting an offer below anticipated costs, expecting to-
>
> (1) Increase the contract amount after award (e.g., through unnecessary or excessively priced change orders), or
>
> (2) Receive follow-on contracts at artificially high prices to recover losses incurred on the buy-in contract.

FAR § 3.501-1. The FAR does not prohibit offerors from "buying-in" in order to win a contract award, however, the FAR acknowledges that buying-in "may decrease competition or result in poor contract performance." FAR § 3.501-2. Accordingly, the FAR imposes an express obligation on the contracting officer to identify instances of buying-in, and to take steps to protect the Government from receiving poor performance or from overpaying for contract performance, or performance of follow-on contracts:

> (a) *Buying-in may decrease competition or result in poor contract performance. The contracting officer must take appropriate action to ensure buying-in losses are not recovered by the contractor* through the pricing of—
>
> (1) Change orders; or
>
> (2) Follow-on contracts subject to cost analysis.

> (b) *The Government should minimize the opportunity for buying-in by seeking a price commitment covering as much of the entire program concerned as is practical* by using—
>
> (1) Multiyear contracting, with a requirement in the solicitation that a price be submitted only for the total multiyear quantity; or
>
> (2) Priced options for additional quantities that, together with the firm contract quantity, equal the program requirements.
>
> (c) Other safeguards are available to the contracting officer to preclude recover of buying-in losses (e.g. amortization of nonrecurring costs and treatment of unreasonable prices quotations).

FAR § 3.501-2 (emphasis added, references omitted).

The temptation to "buy-in" by [redacted] Since the structure of the procurement encouraged offerors to buy-in, the Army had an enhanced obligation to identify instances of buying-in, and to take steps to protect the Government's interests by taking account of them in evaluating both Performance Risk and Price. FAR § 3.501-2.

GAO has recognized the Government's obligation to identify instances of buying-in and to take appropriate steps to protect the Government's interests where buying-in occurs. *Halifax Technical Servs., Inc.*, B-246236 *et al.*, 94-1 CPD ¶ 30 (1994). In *Halifax*, the protester complained that the awardee, Allied, had submitted unrealistically low labor rates in a Marine

Corps procurement for maintenance services. The protester also complained that Allied had proposed a cap on the amount it would charge for certain categories of direct labor, arguing that the cap constituted buying-in. GAO disagreed because the Government had identified Allied's buying-in during contract negotiations, and had taken appropriate action to obtain an overall price commitment from Allied, thus guarding against contractor recovery for buying-in:

> *[W]e agree that Allied's cap may be analogous to a below-cost bid or offer in a fixed-price environment.* However, the FAR guidance to contracting officers does not bar an agency from accepting such an offer. Rather, *the FAR states that contracting officers faced with the possibility of a buy-in must take steps to ensure that an offeror's buying-in losses are not recovered from the government through change orders or follow-on efforts. FAR § 3.501-2(a). In fact, the FAR suggests that one way to minimize such an offeror's likelihood of recovering such losses through other means is to seek a price commitment covering as much of the program as possible-something the contracting officer has done here.* See FAR § 3.501-2(b)(1).

*Halifax*, 94-1 CPD ¶ 30 at 6 (emphasis added). *Harbour Air, Inc.*, B-235534 *et al.*, 89-2 CPD ¶ 86 (1989)(Acceptance of below-cost proposal is acceptable where the Government takes steps to insure that the contractor won't recover its losses via other means).

**B. The Army Failed To Identify [redacted]**

The IGE was based upon [redacted]. The Army had an obligation to identify the [redacted] and to take account of them in evaluating Performance Risk. In addition, the Army had an obligation to identify these [redacted] during proposal evaluation and to take appropriate steps to insure that the awardees do not [redacted]



DC1 30234775.1

[redacted] The Army failed to meet this obligation, and thus violated FAR § 3.501-2.

## V. THE ARMY FAILED TO REASONABLY EVALUATE OFFERORS' PRICES.

### A. The Army Did Not Consider Whether The Proposed Labor Rates Were Reasonable.

At the Debriefing, the Army revealed to BearingPoint that the price evaluation did not even consider whether any of the awardees' labor rates were too low. [redacted]

### B. The Army Was Required To Evaluate Labor Rates To Determine Whether The Offerors Could Provide Qualified Personnel Necessary To Support The PMSS-2 Programs.

The Army should have recognized that the evaluated Total Contract Life Prices of BAH, Wyle and SRAC were so far below the prices that the Army is currently paying for these same services, that it was unreasonable to assume that the anticipated work could be performed at the labor rates the awardees proposed. During BearingPoint's debriefing, the Army indicated that the total ceiling price for the PMSS-2 procurement was $478,642,912.00, [redacted] Thus, the Army applied the labor rates it is currently paying to the hours currently being expended to determine the ceiling price for the

five-year performance of the new contracts. Accordingly, the Army was on clear notice that the awardees' labor rates are far below the rates currently being charged for the same work. By failing even to attempt to determine whether the rates were reasonable, the Army did not meet its statutory obligation to determine the cost to the Government of contract performance or the quality of the resources that the awardees would provide.

The Solicitation required the Government to evaluate the relative extent to which the offerors could provide the "qualified resources" necessary to support the PEO/EIS and CI0/G-6 programs. AR, Tab 3 at 380. Specifically, the Solicitation required the Government to evaluate the relative merits of the offerors' methodologies for "recruitment, training and retention of qualified and security-cleared personnel." AR, Tab 3 at 382. [redacted] It is indisputable that what an offeror proposes to pay its labor force is a critical factor in a company's ability to recruit and retain qualified individuals in the quantities necessary to meet an agency's needs. Thus, an analysis of the offered labor rates was necessary to allow the Army to determine whether the offeror can provide the qualified resources necessary to support the PEO/EIS and the CIO/G-6 programs. The Army failed to do this. [redacted]

[redacted]



DC1 30234775.1

[redacted]

Not only was the Price evaluation thus faulty, but the SSA failed to take this point into consideration when making the best value decision.

### C. The Awardees' [redacted] Imposed On The Army An Obligation To Assess Cost Risk.

The contracts here anticipate the award of T&M or FFP task orders which will be awarded based on the rates each of the awardees' contracts. [redacted]

The fact that the awarded contracts contemplate T&M task orders makes the Army's failure even more egregious. When the awardees submit proposals on individual T&M task orders, they have absolutely no risk, because if the work is not completed when the task order awardee has expended the proposed ceiling hours/price, the contractor has no obligation to continue performance. The Army is then left with the choice of either increasing the ceiling price of the task order, or not having the work completed. Thus, because the Army, rather than the contractor, assumes any cost growth risk in a T&M contract, the Army was obligated to conduct price analysis of the offerors proposed labor rates to determine whether they were reasonable. At the debriefing, the Army acknowledged that it did not do this.

Where the Government's liability is fixed, and the contractor bears the risk and responsibility for the actual costs of performance, the agency is only required to determine that the offeror's price is fair and reasonable. FAR § 15.402(a); *SAMS El Segundo, LLC*, B-291620

*et al.*, 2003 CPD ¶ 48 at 8 (2003). However, in T&M task orders which are contemplated here, the Government bears the performance risk. In such cases, the FAR requires the agency to determine whether the offered prices are realistic. FAR § 15.404-1(a). The FAR further provides that "the complexity and circumstances of each acquisition should determine the level of detail of the analysis required. *Id.* When, as here, offerors are not required to submit cost or pricing data, the agency may use "information other than cost or pricing data to determine cost reasonableness or cost realism." FAR § 15.404-1(a)(4). In this case, the T&M task order structure of the procurement required the Army to determine [redacted]

The FAR provides that the Government may use various price analysis techniques to ensure that offerors' prices are reasonable, and that the ultimate cost to the Government will be fair. The preferred techniques are: (1) a comparison of proposed prices; and (2) a comparison of proposed prices with prices the Government paid for the work under previous contracts. FAR § 15.404-1(b)(3). Given the structure of the procurement, i.e., the ultimate price the Government will pay for individual task orders can not be evaluated based upon a comparison of the offerors' proposed labor rates. Therefore, the Army should have compared the offerors' proposed prices with the prices the Government paid for work under previous contracts. The Army failed to do this. Moreover, the Army also failed to explain or document why the awardees' evaluated prices were substantially below the IGE, which was based upon the prices the Government had previously paid for the work. Without such price analysis, the Army was essentially buying "a pig in a poke," i.e., the Army has no idea whether the awardees' [redacted] will result in reasonably priced task orders. The Army's failure to determine whether the awardee's proposed prices are reasonable prejudiced BearingPoint, because, [redacted]

[redacted]

### D. The Army Failed To Recognize The Advantages In BearingPoint's Staffing Plan.

The procurement only sought offerors' labor rates, it did not ask offerors to propose the number of hours that it would take an offeror to perform a given scope of work. Thus the evaluated price was derived by multiplying offerors' labor rates times the number of hours specified in the Solicitation. While Offerors could have different labor rates for the prime and for each subcontractor, however, for price evaluation purposes the Government took the offeror's highest proposed labor rate for a position and multiplied it by the number of hours for that position in the Solicitation's cost model. This simplistic method of analysis did not allow the Army to properly determine whether offerors were proposing a range of personnel who would be capable of performing the work.

For example, the table below shows the high and low prices for Government Site Work that BearingPoint and each of the large business awardees (BAH, SRAC and Wyle), proposed for the positions with the 10 highest number of total estimated labor hours.

| Position | Hours | Price | Bearing Point | BAH | SRAC | RSIS |
|---|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

The table indicates that in [redacted]

Finally, it is also important to note that the awarded contracts were far below the IGE. The Government's total estimated cost of the services was approximately $478,642,912, [redacted]. AR, Tab 2 at 44. The Acquisition Plan emphasized that [redacted]

[redacted] AR, Tab 2 at 44 (emphasis added). Thus, the Acquisition planners were concerned that proposed hourly rates might be too low to effectively perform the work. However, the Army did not follow the Acquisition Plan because [redacted] AR, Tab 39 at 10574.

In a procurement where the Government seeks labor rates, but not estimated hours, and will award task orders based on a contractor's estimate of how long it will take to perform the work, it is possible to game the procurement by bidding low labor hour rates, using less qualified personnel and proposing significantly more hours on the task orders. The Government mistakenly ignored this during the evaluation and award process, with the result that the Army's evaluation is irrational.

## VI. THE ARMY FAILED TO CONDUCT MEANINGFUL DISCUSSIONS WITH BEARINGPOINT.

The Army engaged in discussions with BearingPoint, however, at no time during these discussions did the Army inform BearingPoint that its [redacted] Statute and regulations require that when the Government engages in discussions with offerors these discussions must be meaningful. *See* FAR § 15.306. "[A]n agency may not mislead an offeror - through the framing of a discussion question or a response to a question - into responding in a manner that does not address the agency's concerns; misinform the offeror concerning a problem with its proposal; or misinform the offeror about the government's requirements." *Metro Mach. Corp.*, B-281872 *et al.*, 99-1 CPD ¶ 101 (1999) (finding that in order for discussions to have been meaningful, the agency was required to inform the protester that its performance approach had to be altered, not just further explained or enhanced.) "An agency fails to conduct

meaningful discussions where it fails to apprise an offeror that its prices were viewed as unreasonably high." *Multimax, Inc.*, B-298249.6 *et al.*, 2006 CPD ¶ 165 (2006) (protester was prejudiced by a lack of meaningful discussions where IFNs did not provide notice that numerous rates in the proposal were found to be overstated). Here, the Army failed to conduct meaningful discussions with BearingPoint because the Army did not [redacted] to BearingPoint's severe detriment.

## VII. THE ARMY'S BEST VALUE TRADE-OFFS WERE UNREASONABLE AND INCONSISTENT WITH THE STATED EVALUATION CRITERIA.

In performing best value trade-offs between [redacted] the SSA abandoned the evaluation criteria by emphasizing Price over Non-Price factors when the Solicitation's evaluation criteria mandated that Non-Price factors were significantly more important than Price. Such an emphasis on Price not only was inconsistent with the stated evaluation criteria, it was particularly nonsensical because the actual work will be awarded through competitively procured FFP and T&M task orders. BearingPoint's [redacted]

Furthermore, the Army improperly [redacted]

The Army also failed to consider whether the awardee's [redacted] were realistic or reasonable, or to analyze the impact on task order costs of the awardee's need for

more labor hours to accomplish the work, and failed to protect against a buy-in in accordance with FAR § 3.501-2. Finally, the Army failed to engage in meaningful discussions with BearingPoint regarding its [redacted] thus impacting the relative merits of BearingPoint's offer, compared with the awardees' offers in the best value decision. The SSA's best value trade-off was based on all of these material errors in the evaluation, therefore the best value trade-off was fatally flawed.

## CONCLUSION

For the reasons discussed above, BearingPoint respectfully submits that it is entitled to Judgment on the Administrative Record, and to the relief that it requested in its June 30th Complaint.

Respectfully submitted,

Dated: July 15, 2008

s/ Kevin P. Connelly

Kevin P. Connelly
SEYFARTH SHAW LLP
815 Connecticut Avenue, N.W., Suite 500
Washington, DC 20006-4004
(202) 828-5374 Telephone
(202) 641-9274 Protected Facsimile
*Counsel for the Plaintiff BearingPoint, Inc.*

Of Counsel:
Joseph J. Dyer
Grace Bateman
SEYFARTH SHAW LLP
815 Connecticut Avenue, N.W., Suite 500
Washington, DC 20006-4004

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 15th day of July 2008, a copy of the foregoing Memorandum in Support of Motion for Judgment on the Administrative Record was filed and served via the Court's electronic filing system on:

Terrence Michael O Connor
Albo & Oblon, LLP
2200 Clarendon Boulevard
Suite 1201
Arlington, VA 22201
(703) 562-3382
Fax: (703) 312-0415
to@albo-oblon.com
*Counsel for Plaintiff Femme Comp Inc.*

James Stephen DelSordo
Argus Legal, LLC
9255 Center Street
Suite 307
Manassas, VA 20110
(703) 368-8770
Fax: (703) 368-8772
delsordo@arguslawfirm.com
*Counsel for Plaintiff Technical and Project Engineering LLC*

Holly Emrick Svetz
Womble Carlyle Sandridge & Rice PLLC
8065 Leesburg Pike
Fourth Floor
Vienna, VA 22182
(703) 394-2261
Fax: (703) 918-2264
hsvetz@wcsr.com
*Counsel for Plaintiff Data Systems Analysts, Inc.*

Warren Jay DeVecchio
Jenner & Block
601 13th Street, NW
Suite 1200
Washington, DC 20005
(202) 639-6893
Fax: (202) 661-4817
jdevecchio@jenner.com
*Counsel for Plaintiff L-3 Services, Inc.*

Kenneth David Woodrow
U. S. Department of Justice
Civil Division, Commercial Litigation Branch
1100 L Street, NW
Room 11030
Washington, DC 20530
202-353-0513
Fax: (202) 514-7969
national.courts@usdoj.gov
*Counsel for Defendant United States*

Timothy Sullivan
Thompson Coburn, LLP
1909 K Street, NW
Suite 600
Washington, DC 20006-1167
(202) 585-6900
Fax: (202) 585-6969
tsullivan@thompsoncoburn.com
*Counsel for Intervenor Defendant Savantage Financial Services, Inc.*

Marcia G. Madsen
Mayer Brown
1909 K Street, NW
Washington, DC 20006-1101
(202) 263-3274
Fax: (202) 263-5274
mgmadsen@mayerbrownrowe.com
*Counsel for Intervenor Defendant Booz Allen Hamilton, Inc.*

*/s/ Kevin P. Connelly*
Kevin P. Connelly

# EXHIBITS A – K
# ARE REDACTED
# IN THEIR
# ENTIRETY